Parker G. Stinar, Esq. (pro hac vice forthcoming)
Patrick C. Lannen, Esq. (pro hac vice)
**STINAR LANNEN, PLLC**
280 W. Maple Rd., Ste. 200
Birmingham, Michigan 48009
Tel: (248) 565-2690
Fax: (248) 565-2691
Email: Parker@StinarLannenLaw.com
Patrick@StinarLannenLaw.com

*Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| IN RE: APPLE AIRTAG MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION<br><br>This Document Relates To:<br><br>JANE K.C. DOE - 21,<br><br>Plaintiff,<br><br>v.<br><br>APPLE INC.,<br><br>Defendant. | MDL No. 3199<br>Case No. 5:26-md-03199-NW<br>Member Case No. __________<br>Hon. Noël Wise<br><br>**COMPLAINT FOR DAMAGES**<br><br>1. Negligence (California Law)<br>2. Strict Products Liability—Design Defect (California Law)<br>3. Products Liability—Failure to Warn (California Law)<br>4. UCL—Unlawful Prong (California Law)<br>5. UCL—Unfair Prong (California Law)<br>6. Strict Products Liability—Design Defect (Colorado Law) (in the alternative)<br>7. Strict Products Liability—Failure to Warn (Colorado Law) (in the alternative)<br>8. Negligence (Colorado Law) (in the alternative)<br>9. Colorado Consumer Protection Act (Colorado Law) (in the alternative)<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Jane K.C. Doe - 21 ("Plaintiff"), through counsel, brings this Complaint against Defendant Apple Inc. She files it directly in In re Apple AirTag Marketing, Sales Practices and Products Liability Litigation, MDL No. 3199, under the Court's direct-filing order. She alleges as follows, on personal knowledge as to herself and on information and belief as to all other matters.

## INTRODUCTION

1. Defendant Apple Inc. ("Apple") must be held accountable for its continuing failure to protect the public from being stalked with its product, the Apple AirTag® ("AirTag").

2. In 2021, Apple released the AirTag. It knew the device could—and would—be bought and used by abusive, controlling people to track, coerce, and endanger their victims.

3. Apple also knew in 2021 that adequate safeguards were not yet in place. It released the AirTag anyway. Since then, Apple has played catch-up. It has quietly added features that still fail to curb the dangers of a product that is now more than five years old.

4. Plaintiff is one of the people Apple's choices left exposed. In September 2023, her former romantic partner used an AirTag to track her in Colorado. The AirTag was hidden in her vehicle and was discovered only after its battery began chirping from inside the center console.

5. Plaintiff carried an iPhone—the very device Apple built its anti-stalking protections around. Those protections still failed her. She did not receive an Apple unwanted-tracking alert before she found the AirTag.

6. The tracking was not abstract. Stalker appeared behind Plaintiff's vehicle after she left work, drove aggressively near her, and questioned her movements. Plaintiff never consented to being tracked, did not place the AirTag, and did not know it was in her vehicle.

7. Apple's design, warning, and release decisions were made at its headquarters in Cupertino, California. Those decisions give rise to liability under California law. Under California law, Apple's acts and omissions constitute negligence and strict products liability for design defect and failure to warn, and violations of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 et seq. In the alternative, and to the extent Colorado law governs any issue, Apple's acts and omissions render the AirTag defective in design and warnings under Colorado law, constitute negligence, and constitute deceptive conduct under the Colorado Consumer Protection Act. Plaintiff seeks actual and punitive damages and other relief.

## PARTIES

8. Plaintiff is an adult individual. She is domiciled in, and a citizen of, the State of Colorado. She resides in Erie, Colorado. She intends to remain in Colorado indefinitely.

9. Defendant Apple Inc. is a corporation organized under the laws of the State of California. Its principal place of business is in Cupertino, California. Apple is therefore a citizen

of California for purposes of 28 U.S.C. § 1332(c)(1). Apple is an American multinational technology company. Among its consumer electronics is the AirTag. Apple oversees all aspects of the AirTag, including its design, manufacture, marketing, technical support, and maintenance. Apple also designs, operates, and maintains the Find My network through which AirTags function, and the iOS unwanted-tracking alerts on which persons like Plaintiff depend. Apple designed these components to work together as a single integrated tracking system, as alleged below.

## JURISDICTION, VENUE, AND DIRECT FILING

10. This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a)(1). Complete diversity exists. Plaintiff is a citizen of Colorado. Apple is a citizen of California. No defendant shares Plaintiff's citizenship.

11. The amount in controversy exceeds $75,000, exclusive of interest and costs. Plaintiff seeks actual damages for severe mental anguish, emotional distress, fear for her physical safety, loss of her sense of autonomy and security in her home and vehicle, property and security-related losses, medical or therapy expenses, and related economic losses. She also seeks punitive damages under California law and reserves any other relief permitted by applicable law. Together, these damages exceed the jurisdictional threshold.

12. This Court has general and specific personal jurisdiction over Apple. Apple is incorporated in California and has its principal place of business in this District. Apple is at home here.

13. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because Apple resides in this District. Venue is also proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred here. On information and belief, Apple designed the AirTag, designed its anti-stalking safeguards, decided to release it, and decided how to warn the public from its Cupertino headquarters. Plaintiff chooses this District as the venue for this action for all purposes, including trial.

14. Plaintiff files this Complaint directly in this District and in MDL No. 3199, as permitted by Pretrial Order No. 1 (the "Direct Filing Order"). Under the Direct Filing Order, Plaintiff designates the Northern District of California as the proper venue for this action.

15. Venue in this District does not depend on the Direct Filing Order. Because Apple resides here and a substantial part of the events and omissions giving rise to Plaintiff's claims occurred here, Plaintiff could have filed this action in this District independent of MDL No. 3199. Plaintiff does not designate any other district as her home or transferor venue.

16. **Intradistrict Assignment.** Under Civil L.R. 3-2(c) and 3-5(b), this action relates to MDL No. 3199. It should be assigned to the Division and the Judge presiding over that proceeding.

## CHOICE OF LAW

17. Plaintiff pleads her claims under California law first. She pleads her claims under Colorado law in the alternative. Plaintiff does not concede that the law of either State governs any particular issue, including limitations and tolling.

18. California law should govern Plaintiff's claims. This action was filed in this District, and California's choice-of-law rules therefore apply. The conduct Plaintiff challenges occurred in California. On information and belief, Apple's officers and managing agents in Cupertino made the decisions to release the AirTag with safeguards Apple knew were inadequate; to keep selling it after tens of thousands of stalking reports; to deliver safety fixes through owner-dependent firmware; and to describe stalking incidents to the public as "rare." Apple designs and operates the Find My network and the iOS alert software from California. California has a strong interest in regulating the conduct of a California corporation that designs dangerous products in California and sells them nationwide. It also has a strong interest in deterring wrongful conduct by its own corporations through punitive damages, and that interest would be impaired if a California corporation could avoid California's standards whenever its in-state decisions injure someone in another State.

19. In the alternative, Colorado law should govern the Colorado-law counts to the extent the Court determines that Colorado has the greater interest in any issue. Plaintiff is a Colorado domiciliary. She lived in Colorado, was tracked on Colorado roads and in Colorado parking lots, and was confronted by the Stalker in and around Boulder, Colorado. She suffered her injuries there. She sought protection from Colorado law enforcement and obtained a temporary restraining order through Colorado proceedings. Her treatment, security, and legal expenses were incurred in Colorado. Colorado has a strong interest in compensating its residents for injuries suffered within its borders and in applying its product liability and consumer protection statutes, Colo. Rev. Stat. §§ 13-21-401 et seq. and 6-1-101 et seq., to products sold and used in Colorado.

20. Plaintiff does not concede that any conflict exists between Colorado and California law on any issue. If a true conflict exists, Plaintiff reserves the right to brief the choice of law at the appropriate stage.

**GENERAL ALLEGATIONS**

21. On April 2, 2024, ITV News in the United Kingdom aired a report on AirTag stalking.[1] In response, Apple stated: "We have identified even more ways we can update AirTag safety warnings and help guard against further unwanted tracking."

22. This promise of future, unspecified action came too late for Plaintiff. Apple's product had already been designed and sold with safeguards that could not reliably prevent or promptly detect stalking. The time for adequate safety warnings and better protections was April 2021, before the AirTag's release.

23. Apple has always known that any safeguards it built into AirTags would only, in Apple's own words, "deter as opposed to prevent malicious use."

---

[1] ITV News, *AirTags Becoming "Weapon of Choice of Stalkers" as GPS Tracker Cases Rocket by 317%*, YouTube (Apr. 2, 2024), https://www.youtube.com/watch?v=TBhYdgt1FhE.

24. Each year, an estimated 13.5 million people are stalked in the United States. Nearly one in three women and one in six men experience stalking at some point in their lives.[2]

25. Apple's AirTags have become a critical—and shameful—part of this problem. From 2021 forward, Apple has received over 40,000 stalking reports, at times averaging 1,000 complaints per month.

26. Stalking takes many forms. Most often it involves unwanted, repeated behavior that would cause fear in a reasonable person. Whatever the method, the common thread is the fear it creates in the victim.

27. That fear erodes a victim's autonomy and disrupts daily life. One in eight employed stalking victims misses work because of the victimization. More than half of those lose more than five days of work. One in seven stalking victims moves as a result.[3]

28. Stalking victims suffer much higher rates of depression, anxiety, insomnia, and social dysfunction than the general population. Most report a fear of not knowing what will happen next. Stalking is a significant risk factor for homicide in abusive relationships.

29. No one disputes any of this. Stalking is a serious, well-documented phenomenon. It ruins lives, and it ends them.

30. Knowing all this, Apple released a small, concealable device. It allows anyone with an iPhone to continuously and precisely track another person's location for $29.00.

31. Before releasing the AirTag in April 2021, Apple knew it would be used as a stalking tool. Apple even designed certain features to reduce that risk. But Apple released the product knowing those features could not prevent stalking.

32. At release, Apple knew the AirTag's anti-stalking measures were inadequate for at least these reasons:

---

[2] Stalking Prevention, Awareness, and Resource Ctr. (SPARC), *Stalking Fact Sheet* 1 (2019), https://www.stalkingawareness.org/wp-content/uploads/2019/01/SPARC_StalkngFactSheet_2018_FINAL.pdf.

[3] Katrina Baum et al., U.S. Dep't of Just., Bureau of Just. Stat., *Stalking Victimization in the United States* 1 (Jan. 2009), https://www.justice.gov/archive/ovw/docs/bjs-stalking-rpt.pdf.

a. The iPhone notification system alerted users to an unknown AirTag only after three days—an eternity in a stalking situation;

b. Android users received no notifications at all, leaving roughly half of the smartphone-using population unprotected;

c. The AirTag's speaker, meant to alert a victim to an unknown AirTag, was quiet, easily muffled, and easily defeated, and instructions for disabling it were widely available online; and

d. The AirTag's small, light, and concealable form made it trivially easy to hide in a victim's belongings or vehicle.

33. Apple made a calculated business decision to release the AirTag anyway. It put market timing and profits ahead of human safety.

34. The consequences were swift and predictable. Soon after the April 2021 release, reports poured in from people who had been stalked, tracked, and terrorized with AirTags.

35. Stalkers have used AirTags to track victims to their homes, workplaces, and places of refuge. AirTags have been hidden in wheel wells, under bumpers, in purses, in jacket pockets, and in children's backpacks.

36. AirTags have enabled abusers in domestic situations to monitor and control the people closest to them. Many victims had no idea they were being tracked until it was too late.

37. The consequences have been as severe as possible. Multiple murders have occurred in which the killer used an AirTag to track the victim.

38. With its "stalker-proof" protections exposed as inadequate, Apple has spent five years scrambling. Most of these failures persist. Apple keeps reacting to harm its product has caused instead of preventing it. As one commentator put it: "You wouldn't allow a car to come to

mass-market without having vigorous testing, so why are we allowing smart tech to just be released and then fixing safety features later?"[4]

## FACTUAL ALLEGATIONS

### A. How the AirTag Works

39. Apple introduced the AirTag in April 2021 as a standalone product.[5] It is about the size of a U.S. quarter. It is a tracking beacon marketed to help consumers find objects such as keys or purses.

40. The AirTag uses Bluetooth Low Energy ("BLE") technology. It broadcasts a rotating identifier. Nearby Apple devices detect that signal and relay the AirTag's location to Apple's servers through the "Find My" network.

41. The Find My network turns the world's Apple devices into a mesh tracking network. Any powered-on, connected iPhone, iPad, or Mac can relay an AirTag's location. There are over two billion active Apple devices. The network works silently, without the knowledge or consent of the device owners who relay the data.

42. The AirTag does not work alone. Apple designed the AirTag hardware, the Find My network, and the iOS unwanted-tracking alerts to function as one integrated system. The AirTag broadcasts the signal. The Find My network, running on Apple devices and Apple servers, locates the AirTag and reports its position to the owner. The iOS unwanted-tracking alerts are the safety component Apple built into that same system to warn the person being tracked. Apple designs, controls, updates, and markets each component together. A defect in any component is a defect in the product Apple placed in the stream of commerce. In this Complaint, references to the "AirTag" include that integrated system unless the context indicates otherwise.

43. Plaintiff was not a stranger to this system. She carried an Apple iPhone. Apple designed the iOS unwanted-tracking alerts on that iPhone to warn her, the person being tracked,

---

[4] Ellie Fry, *Inside Chilling Rise of AirTag Stalking as Apple Device Is Branded 'Gift to Abusers'*, The Mirror (Apr. 24, 2023), https://www.mirror.co.uk/tech/inside-chilling-rise-airtag-stalking-29746435.

[5] Press Release, Apple Inc., *Apple Introduces AirTag* (Apr. 20, 2021), https://www.apple.com/newsroom/2021/04/apple-introduces-airtag/.

that an unknown AirTag was traveling with her. Plaintiff was the intended recipient of those alerts and a user of Apple's integrated tracking-safety system. As the Judicial Panel on Multidistrict Litigation observed in centralizing these cases, for plaintiffs who own an Apple device, "it may have been their own Apple device that shared their location with their stalker." In re Apple AirTag Mktg., Sales Pracs., & Prods. Liab. Litig., 2026 U.S. Dist. LEXIS 227118 (J.P.M.L. Oct. 2, 2026). On information and belief, Plaintiff's own iPhone was among the Apple devices that detected the AirTag traveling with her.

44. As a result, an AirTag's location can be updated virtually anywhere—including on the streets, parking lots, and driveways of Colorado.

**B. Apple Knew the AirTag Would Be Used to Stalk**

45. Before the AirTag's release, commentators, journalists, and domestic violence advocates publicly warned that small, cheap Bluetooth trackers would be used as stalking tools.

46. Apple was well aware of these concerns. Apple anticipated that the AirTag would be used for unwanted tracking.

47. Apple described the AirTag's anti-stalking features as designed to "deter as opposed to prevent" malicious use. That was an admission that Apple knowingly released the product with inadequate safeguards.

48. Apple launched the AirTag with only minimal safeguards. These were (a) an audible alert that sounded after three days away from the owner's iPhone, and (b) a notification that alerted iPhone users—but not Android users—to an unknown AirTag traveling with them.

49. These measures were woefully inadequate. Three days without an alert gives a stalker ample time to learn a victim's home, workplace, and routine.

50. About half of U.S. smartphone users use Android devices. At launch, they had no way to detect an AirTag tracking them. Apple released a "Tracker Detect" app for Android in December 2021, eight months after launch. The app required users to start a scan manually.

51. In February 2022, Apple announced it would cut the time before an unknown AirTag sounds from three days to a random interval between 8 and 24 hours. Even that interval gives a stalker ample time to locate a victim's home, workplace, and routine.

52. Apple's piecemeal approach—half-measures adopted only after public outcry—shows that Apple has consistently put sales ahead of safety.

**C. The AirTag's Safeguards Fail Even iPhone Users**

53. Apple's protections fail even the iPhone users they were built for. Plaintiff is one of them.

54. The iOS "Item Safety Alerts" feature relies on algorithms that often fail to detect tracking in time. An unknown AirTag must travel with the victim for some period before any alert issues. During that window, the stalker can watch the victim's every move.

55. The alerts are easy to miss. They look like ordinary push notifications. They can be buried, swiped away, or simply overlooked. Users who turn off Location Services for privacy reasons also lose these alerts. Apple does not explain this.

56. An alert, standing alone, does not tell the victim where the AirTag is. To find it, the victim must rely on the AirTag's sound. That sound is deficient in at least four ways:

a. It is too quiet. The alert reaches about 60 decibels at most. A purse, fabric, or a car's exterior can muffle it;

b. It is not distinct. The chime sounds like countless other device alerts;

c. It is not continuous. It stops before the person can find the device; and

d. It is easily disabled. The AirTag keeps working after the speaker is removed, and online tutorials explain how.

57. Even when a victim finds an AirTag, her options are limited. She must take physical possession of it and remove its battery. Finding it may be impossible or costly. Dismantling it can compromise evidence. And the stalker can simply deploy another AirTag.

58. Safety updates to AirTag firmware are not pushed automatically to the victim. They depend on the AirTag's owner—the stalker—to install them.

### D. Feasible Safer Alternative Designs Existed

59. At all relevant times, safer alternative designs existed. Each would have prevented or significantly reduced the risk of AirTag stalking without substantially impairing the product's utility for finding lost items. Each was economically and technologically feasible when the AirTag left Apple's control, using existing or reasonably achievable scientific knowledge. Among other things, Apple could have:

a. alerted a tracked person within minutes, not hours or days;

b. designed a louder, distinct, continuous, non-removable, and tamper-resistant speaker, and rendered the AirTag non-functional if the speaker were disabled;

c. enabled precise, on-demand location of an unknown AirTag by the person it is traveling with, so the victim could find a concealed device without police help;

d. required identity verification or account linking before activation, creating accountability and deterring anonymous stalking;

e. automatically disabled tracking when an AirTag stays near a non-owner's device for a defined period;

f. required periodic owner re-authentication to prevent indefinite passive tracking;

g. released simultaneous, equivalent, automatic detection for Android users at launch; and

h. made the AirTag larger and more conspicuous, so it could not be easily hidden under a vehicle's bumper.

60. Apple chose not to adopt any of these designs.

### E. Apple Consciously Disregarded the Danger

61. Only weeks after the AirTag's release, Apple CEO Tim Cook was briefed on press reports describing the AirTag as "a new means of inexpensive, effective stalking." Cook was told that Apple could weather the storm: "At this time, we are not seeing this narrative gain steam in media or on social…." Apple chose to manage the narrative instead of the danger.

62. Apple's officers, directors, and managing agents, including Mr. Cook, authorized, directed, or ratified the decision to release and keep selling the AirTag without adequate safeguards. They did so with knowledge of the ongoing harm. On information and belief, the decisions to launch the AirTag in April 2021 with a three-day alert interval, to launch without any Android detection, to defer the Android "Tracker Detect" app until December 2021, to shorten the alert interval only in February 2022, and to keep selling the AirTag as the stalking reports accumulated were made or approved by Apple's executive leadership in Cupertino, including Mr. Cook and the senior executives responsible for hardware engineering, software engineering, and worldwide marketing.

63. These executives had authority to set Apple's product-safety, design, and release policy for the AirTag. Their decisions determined the safeguards every AirTag would carry. After Mr. Cook was briefed on the stalking reports in 2021, these executives chose to continue selling the AirTag, to make only incremental changes, and to describe stalking publicly as "rare." That continuing course of conduct, undertaken with knowledge of the harm, authorized and ratified the conduct alleged in this Complaint within the meaning of Cal. Civ. Code § 3294(b).

64. Apple publicly called AirTag stalking "rare." Its internal data showed more than 40,000 unwanted-tracking reports in the three years after release, ending in April 2024. Apple also knew that most law-enforcement requests it received about AirTags concerned stalking.

65. Apple has also failed to support victims. Its legal-process guidelines state that AirTag pairing history is available for only up to 25 days. Victims who seek protection or prosecution are often left without the evidence they need.

66. The AirTag sells for about $29. Apple has sold tens of millions. Before the AirTag, effective GPS trackers were expensive, needed monthly subscriptions, and were hard to hide. The AirTag removed those barriers.

67. The harm is ongoing. Apple continues to sell AirTags with safeguards that remain inadequate.

## PLAINTIFF'S EXPERIENCE WITH AIRTAGS

68. At the time of the events described below, Plaintiff lived in Erie, Colorado. The tracking described below occurred in and around Boulder, Colorado.

69. Plaintiff had previously been in a romantic relationship with a man who is referred to here as the "Stalker."

70. Plaintiff used an iPhone running iOS. At all relevant times, Location Services, Bluetooth, and Tracking Notifications were enabled on her iPhone, and she had not disabled Item Safety Alerts or any other Apple safety setting. She did not receive an Apple notification that she was being tracked before she found the AirTag.

71. On September 16, 2023, Plaintiff discovered a physical Apple AirTag in her vehicle. A photograph taken that morning shows an Apple AirTag being held inside a vehicle.

72. On information and belief, Stalker placed the AirTag in Plaintiff's vehicle, and it remained there, reporting her location before she found it. Plaintiff first noticed Stalker appearing where she was, without explanation. Throughout that period, Plaintiff's iPhone traveled with the AirTag in her vehicle and never alerted her to it.

73. Plaintiff discovered the AirTag only because it eventually began chirping from inside the center console. The sound came only after the AirTag had already tracked her for some time. It was faint, intermittent, and muffled by the console, and it stopped before she could locate its source. She had to dig through the console, repeatedly, to find the device. The chirp did not show that Apple's safeguards worked. It shows the defect: the sound came late, it could not lead her to the device, and nothing on her iPhone told her an AirTag was traveling with her.

74. Plaintiff did not place the AirTag in her vehicle, did not consent to its placement, did not know it was there, and did not consent to being tracked by it.

75. From the time it was hidden, Apple's Find My network could report Plaintiff's location to the AirTag owner wherever Plaintiff drove and wherever she parked.

76. Stalker used location information to monitor and confront Plaintiff. After Plaintiff left work one day, Stalker appeared behind her vehicle and drove aggressively near her.

77. Stalker questioned Plaintiff when she stopped places, including ordinary stops, and threatened to harm her if she lied to him.

78. Plaintiff did not report the AirTag to law enforcement immediately because Stalker had threatened to make false allegations against her if she went to police.

79. Plaintiff later reported the stalking and related conduct to the Boulder County Sheriff's Office on or about August 2026. She delayed because of Stalker's threat to make false allegations against her and her fear for her safety. He repeated the threats including after she found the AirTag. Plaintiff believed that if she went to the police, Stalker would follow through and would retaliate against her physically. She took protective steps as soon as she could safely do so: she consulted counsel, sought a temporary restraining order, and reported to the Sheriff's Office.

80. Law enforcement involvement included a temporary restraining order and a pending trial. Plaintiff also reported the matter to her attorney, employer, family or friends, and therapist.

81. Plaintiff also reported that, after she removed the AirTag, Stalker added an Apple Watch to her mobile account without permission.

82. The stalking placed Plaintiff in fear for her physical safety and her life. When Stalker appeared behind her vehicle, drove aggressively near her, and threatened to harm her, she was within the zone of physical danger his conduct created, and she feared imminent bodily harm. Her distress has manifested in physical symptoms, including insomnia, panic attacks, headaches, and loss of appetite. The stalking also caused loss of safety in her own vehicle.

83. Plaintiff would have discovered the AirTag sooner, or Stalker would have been deterred from using it, if Apple had adopted the safer alternative designs and warnings described above.

84. An immediate and persistent alert would have told Plaintiff that she was being followed, not left her to discover the device only when its battery chirped.

85. Precise on-demand location by the tracked person would have helped Plaintiff find the AirTag without having to dig through a cluttered center console to find a sound.

86. Better account controls and anti-stalking warnings would have made it harder for Stalker to use Apple devices as tools of coercive control.

87. As a direct and proximate result, Plaintiff has suffered severe mental anguish and emotional distress. She learned that Stalker could monitor her location and confront her after she left work.

88. Plaintiff has also lost money or property because of Apple's conduct, including security-related expenses, legal or protective-order expenses, therapy or treatment expenses, and other out-of-pocket losses.

**STATUTE OF LIMITATIONS AND TOLLING**

89. Plaintiff's claims are timely under the law of either State. Plaintiff does not concede that California or Colorado law governs limitations or tolling for any claim. That question turns on the Court's choice-of-law analysis, and Plaintiff pleads both in the alternative. Under California law, Plaintiff's negligence and products liability claims are subject to the two-year period of Cal. Civ. Proc. Code § 335.1, as tolled. Under Colorado law, product liability actions must be brought within two years after the claim for relief arises, Colo. Rev. Stat. § 13-80-106(1), and her Colorado Consumer Protection Act claim is governed by Colo. Rev. Stat. § 6-1-115.

90. Colorado has adopted the class-action tolling rule of *American Pipe and Crown, Cork & Seal*.

91. On December 5, 2022, a putative class action was filed against Apple in the U.S. District Court for the Northern District of California. It is captioned *Hughes v. Apple, Inc.*, No. 3:22-cv-07668-VC (the "*Hughes* Action"). The *Hughes* Action asserted claims on behalf of a proposed nationwide class of people who were tracked, stalked, or otherwise harmed through AirTags. It arose from the same course of conduct alleged here: Apple's release and continued sale of the AirTag without adequate safeguards against unwanted tracking.

92. The *Hughes* Action asserted, on behalf of the proposed nationwide class, claims for negligence, strict products liability for design defect and failure to warn, and consumer-protection

violations arising from the same alleged defects in the AirTag system. Plaintiff's claims here are the same claims, asserted individually.

93. Plaintiff was tracked without her knowledge or consent by a concealed AirTag while the Hughes Action was pending. She is, and at all relevant times was, a member of the putative class asserted in the Hughes Action. She did not opt out. She was not a named plaintiff. She relied on the named plaintiffs to press the class's claims.

94. On March 9, 2026, the Honorable Vince Chhabria entered an order denying class certification in the *Hughes* Action. (Hughes Action, ECF No. 287.)

95. Under *American Pipe & Construction Co. v. Utah*, 414 U.S. 538, 554 (1974), "the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action." Once tolled, the limitations period "remains tolled for all members of the putative class until class certification is denied." *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 354 (1983).

96. Plaintiff's claims accrued no earlier than September 16, 2023, when she discovered the AirTag. The *Hughes* Action was already pending on that date. The limitations period therefore did not begin to run until class certification was denied on March 9, 2026. Plaintiff filed this action within two years of that date.

97. The purposes of limitations statutes are fully served. The *Hughes* Action put Apple on notice of the claims and of the generic identities of the potential plaintiffs. Since 2022, Apple has been on notice to preserve evidence about AirTag stalking of class members like Plaintiff.

98. Extraordinary circumstances beyond Plaintiff's control prevented her from asserting her claims earlier. Stalker threatened to make false allegations against her if she went to the police, and she feared for her life, as alleged in detail above. She was engaged in restraining-order proceedings arising from the stalking. And Apple's practice of retaining AirTag pairing history for no more than 25 days deprived her of the evidence needed to identify the AirTag's

owner and confirm the source of the tracking. Plaintiff acted diligently once those obstacles allowed, as the timeline alleged above shows.

99. As to the Colorado Consumer Protection Act claim, Apple knowingly concealed the inadequacy of its anti-stalking safeguards and the scope of AirTag stalking, including by publicly describing stalking as “rare” while its internal data showed tens of thousands of unwanted-tracking reports. Under Colo. Rev. Stat. § 6-1-115, the limitations period is tolled until discovery of the deceptive practice where the defendant knowingly concealed it.

**COUNT I**

**NEGLIGENCE**

**(California Law)**

100. Plaintiff repeats and realleges all preceding paragraphs.

101. Under California negligence principles, Apple owed Plaintiff a duty of reasonable care in the design, testing, marketing, distribution, and post-sale support of the AirTag.

102. Each relevant consideration supports that duty. Harm to people like Plaintiff was highly foreseeable. The certainty that such people would be injured was great. The connection between Apple’s conduct and Plaintiff’s injuries was close. Moral blame attaches to Apple’s knowing release of an inadequately safeguarded product. And public policy favors preventing the harm.

103. As the manufacturer that designed the AirTag and placed it into the stream of commerce, Apple had a duty to avoid exposing foreseeable users and bystanders—including persons foreseeably tracked by the device—to unreasonable risks of harm. That duty included designing the AirTag so it would not create an unreasonable risk of use as an instrument of criminal stalking. Apple specifically anticipated and acknowledged that risk before launch.

104. Apple’s duty does not depend on any duty to control the Stalker. It arises from Apple’s own affirmative conduct: Apple designed, built, and sold the AirTag system, and that system created the risk of covert tracking. Apple’s liability rests on its own conduct in creating that risk, not on any failure to control a third party

105. Apple's duty ran directly to Plaintiff. She carried an Apple iPhone and was the intended recipient of the iOS unwanted-tracking alerts that Apple designed as part of its integrated AirTag system. She was not a remote bystander.

106. Apple breached its duty. Among other things, Apple released the AirTag knowing its safeguards would only "deter as opposed to prevent" stalking; designed alerts that issue only after a tracking device has traveled with the victim for hours or days; designed a speaker too quiet, too brief, and too easily muffled to lead a victim to a concealed device; failed to adopt the feasible safer alternative designs alleged above; failed to adequately test the AirTag's anti-stalking features in real-world concealment scenarios, including placement inside a vehicle's center console; and continued to sell the AirTag after learning of tens of thousands of stalking reports, while publicly minimizing the problem.

107. Apple's breach was a substantial factor in causing Plaintiff's injuries. The Stalker's use of the AirTag was not an unforeseeable superseding cause. It was the very harm that Apple anticipated, was warned about, and designed its safeguards—inadequately—to prevent.

108. Apple designed the AirTag's unwanted-tracking safeguards to prevent this precise criminal use: an AirTag owner covertly tracking another person. The Stalker did exactly what those safeguards were built to stop. A risk that Apple foresaw and designed against cannot be a superseding cause.

109. As a direct and proximate result of Apple's negligence, Plaintiff suffered the injuries described above and is entitled to compensatory damages.

110. Apple acted with malice, oppression, or fraud within the meaning of Cal. Civ. Code § 3294. Its officers, directors, and managing agents knew of the probable dangerous consequences of the AirTag's design and consciously chose not to avoid them. Plaintiff is entitled to punitive damages under California law.

## COUNT II

## STRICT PRODUCTS LIABILITY: DESIGN DEFECT

## (California Law)

111. Plaintiff repeats and realleges all preceding paragraphs.

112. Apple designs, manufactures, distributes, and sells AirTags. Apple placed the AirTags used to track Plaintiff into the stream of commerce. The product at issue is the integrated AirTag system alleged above: the AirTag hardware, the Find My network, and the iOS unwanted-tracking alerts, each designed and controlled by Apple. Independently of the Find My network and iOS software, the AirTag hardware itself was defective. Its speaker was too quiet, removable, and not tamper-resistant. Its form allowed covert concealment. Its firmware relied on owner-initiated updates. Each defect alone made the AirTag unreasonably dangerous.

113. Plaintiff was a user of that system. She carried an Apple iPhone and was the intended recipient of its unwanted-tracking alerts.

114. The AirTag is defective in design under the risk-benefit test. Its foreseeable risk of facilitating stalking outweighs the benefits of its design. Practical, technically feasible alternative designs existed that would have prevented or significantly reduced Plaintiff's injuries without impairing the AirTag's usefulness for finding lost items. They include immediate, reliable, and tamper-resistant alerts; alerts that disclose every unknown AirTag traveling with the tracked person; precise on-demand location by the tracked person; a louder, continuous, non-removable speaker; and design features that reduce covert placement and continued tracking. Each is described in detail above. The gravity and likelihood of the danger are great: stalking, terror, assault, and death. The cost of the alternatives is modest.

115. In the alternative, the AirTag is defective in design under the consumer-expectations test. It failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable way. Consumers may know that tracking devices can be misused. But an ordinary consumer would reasonably expect that Apple had built effective safeguards to detect and prevent unauthorized tracking, particularly given Apple's promotion of

the AirTag's anti-stalking features. This expectation does not require technical knowledge. It is the simple, everyday expectation that a phone marketed as protecting its user from unknown trackers will tell her when one is following her. An ordinary iPhone user would expect her iPhone to warn her promptly when an unknown AirTag was being used to follow her, to help her find it, and to keep warning her until the tracking stopped. The AirTag failed those expectations.

116. The design defect was a substantial factor in causing Plaintiff's injuries. The Stalker's criminal use of the AirTag was not an unforeseeable superseding cause. It was the very harm the AirTag's anti-stalking safeguards were designed—and failed—to prevent. Apple's admission that its safeguards would only "deter as opposed to prevent" malicious use confirms that Apple anticipated and accepted the risk of exactly this conduct.

117. Apple designed the AirTag's unwanted-tracking safeguards to prevent this precise criminal use: an AirTag owner covertly tracking another person. The Stalker did exactly what those safeguards were built to stop. A risk that Apple foresaw and designed against cannot be a superseding cause.

118. As a direct and proximate result of the AirTag's defective design, Plaintiff suffered the injuries described above and is entitled to compensatory damages. Apple's conscious disregard of the known safety risks constitutes malice, oppression, or fraud under Cal. Civ. Code § 3294. Plaintiff is entitled to punitive damages under California law.

**COUNT III**

**PRODUCTS LIABILITY: FAILURE TO WARN**

**(California Law)**

119. Plaintiff repeats and realleges all preceding paragraphs.

120. Apple designed, manufactured, distributed, and sold the AirTags used to track Plaintiff.

121. Plaintiff was the intended recipient of Apple's warnings. Apple's iOS unwanted-tracking alerts, part of its integrated AirTag system, are warnings Apple designed to reach the person being tracked, on that person's own iPhone. Plaintiff carried an iPhone.

122. When the AirTag left Apple's possession, it posed known or knowable risks. Those risks included covert tracking of non-consenting persons and the failure of Apple's alerts to notify iPhone users like Plaintiff in time, to locate the device, or to keep warning until the tracking stopped. Apple knew of these risks, or could have known of them in light of the information available to it at the time of manufacture and distribution. That information included its own pre-launch assessment that its safeguards would only "deter as opposed to prevent" malicious use.

123. These risks presented a substantial danger when the AirTag was used in an intended or reasonably foreseeable way. Ordinary consumers, and people like Plaintiff who could be tracked by an AirTag, would not have recognized them.

124. Apple failed to adequately warn of these risks or to instruct the public on how to detect and guard against unwanted tracking. Among other things, Apple failed to provide timely alerts to people being tracked; failed to provide alerts that are persistent, distinct, and accompanied by a sound loud and continuous enough to locate a concealed device; failed to instruct tracked persons how to locate an AirTag hidden in a vehicle or personal effects; failed to disclose that disabling Location Services would also disable unknown-AirTag alerts; and failed to accurately disclose the scope of AirTag stalking, which Apple publicly called "rare." Apple also failed to act as a reasonable manufacturer would have acted, after sale, once it learned of tens of thousands of stalking reports.

125. Apple's failure to warn was a substantial factor in causing Plaintiff's injuries. Had Apple given adequate warnings and instructions, Plaintiff would have followed them. She would have inspected for every unknown AirTag, found the device sooner, and avoided or reduced the harm alleged above. Plaintiff kept Item Safety Alerts and Tracking Notifications enabled precisely so she would be warned. A timely, specific alert would have reached her through the very settings she had turned on.

126. Apple designed the AirTag's unwanted-tracking warnings to prevent this precise criminal use: an AirTag owner covertly tracking another person. The Stalker did exactly what

those warnings were built to stop. A risk that Apple foresaw and warned against, inadequately, cannot be a superseding cause.

127. As a direct and proximate result of Apple's failure to warn, Plaintiff suffered the injuries described above and is entitled to compensatory damages. Apple's conscious disregard of the known risk also entitles Plaintiff to punitive damages under Cal. Civ. Code § 3294.

**COUNT IV**

**VIOLATION OF THE UNFAIR COMPETITION LAW: UNLAWFUL PRONG**

**(Cal. Bus. & Prof. Code §§ 17200 et seq.)**

128. Plaintiff repeats and realleges all preceding paragraphs.

129. The Unfair Competition Law ("UCL") prohibits any unlawful, unfair, or fraudulent business act or practice. Cal. Bus. & Prof. Code § 17200.

130. Apple engaged in business acts and practices in California. On information and belief, Apple designed the AirTag and its safeguards, decided to release and keep selling it, and decided how to warn the public at its Cupertino headquarters.

131. Apple's conduct is unlawful. As alleged above, it constitutes negligence and products liability under California law. Each of those independent violations serves as a predicate for the UCL's unlawful prong.

132. Apple's conduct also violates the policy and purpose of the California Invasion of Privacy Act, Cal. Penal Code §§ 630 et seq. Apple designed, released, and kept selling the AirTag without adequate safeguards against unconsented location tracking. It failed to give Plaintiff a timely and reliable way to detect and locate the AirTag tracking her. In doing so, Apple aided, and was a substantial factor in enabling, the electronic tracking of Plaintiff's location and movements by a third party without her consent.

133. Plaintiff has standing under Cal. Bus. & Prof. Code § 17204. She suffered injury in fact and lost money or property as a result of Apple's conduct, as alleged above.

134. Plaintiff continues to carry an iPhone and rely on Apple's unwanted-tracking alerts. The Stalker has continued to threaten her and accessed her mobile account after she removed the

AirTag. She faces a real and immediate threat of being tracked again by an AirTag that Apple's current safeguards will not timely detect.

**COUNT V**

**VIOLATION OF THE UNFAIR COMPETITION LAW: UNFAIR PRONG**

**(Cal. Bus. & Prof. Code §§ 17200 et seq.)**

135. Plaintiff repeats and realleges all preceding paragraphs.

136. Apple's business practices are unfair. Releasing and continuing to sell AirTags with safeguards Apple knew were inadequate is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers. The gravity of the harm far outweighs any utility of Apple's conduct.

137. Apple's business practices are also unfair because they undermine public policy tethered to specific constitutional and statutory provisions. Those provisions include the California Invasion of Privacy Act, Cal. Penal Code §§ 630 et seq., and the right to privacy in the California Constitution, Cal. Const. art. I, § 1.

138. Apple's business practices are further unfair because (1) the injury to consumers is substantial; (2) the injury is not outweighed by any countervailing benefit to consumers or competition; and (3) consumers could not reasonably have avoided it. Plaintiff could not avoid a danger hidden in her vehicle's center console that her iPhone did not timely disclose or help her locate.

139. Reasonably available alternatives existed to further Apple's legitimate business interests. Apple's practices are a continuing course of unfair competition because Apple continues to sell AirTags.

140. Plaintiff has standing under Cal. Bus. & Prof. Code § 17204. She suffered injury in fact and lost money or property as a result of Apple's conduct, as alleged above.

141. Plaintiff continues to carry an iPhone and rely on Apple's unwanted-tracking alerts. The Stalker has continued to threaten her and accessed her mobile account after she removed the

AirTag. She faces a real and immediate threat of being tracked again by an AirTag that Apple's current safeguards will not timely detect.

**COUNT VI**

**STRICT PRODUCTS LIABILITY: DESIGN DEFECT**

**(Colorado Law; Pleaded in the Alternative)**

142. Plaintiff repeats and realleges the preceding paragraphs.

143. Apple designed, manufactured, marketed, and sold the AirTag used to track Plaintiff, as part of the integrated AirTag system alleged above, including the Find My network and the iOS unwanted-tracking alerts. Apple placed the AirTag into the stream of commerce in the regular course of its business. The AirTag reached the Stalker without substantial change in its condition.

144. When the AirTag left Apple's control, it was defectively designed and unreasonably dangerous. Use of the AirTag to covertly track a person is a reasonably foreseeable use. Apple actually foresaw it, as alleged above. The risk is grave: stalking, terror, assault, and loss of personal safety.

145. Plaintiff was a user of that integrated system and the intended recipient of its unwanted-tracking alerts on her own iPhone.

146. Colorado defines a product liability action to include actions against a manufacturer or seller, regardless of substantive legal theory, for personal injury, death, or property damage caused by product design, labeling, sale, failure to warn, or failure to provide instructions. Colorado applies the risk-benefit test where the dangerousness of a design is defined primarily by technical, scientific information.

147. For a technically complex product such as the AirTag, the risk-benefit test—not the consumer-expectation test—is the governing design-defect test. A product is unreasonably dangerous in design where the risks of the challenged design outweigh its benefits, and Plaintiff bears the burden under the risk-benefit analysis. Relevant factors include the product's utility, the likelihood and seriousness of injury, the availability of a safer substitute, the manufacturer's ability to eliminate the danger without impairing utility, the user's ability to avoid the danger, the user's

anticipated awareness of the danger or suitable warnings, and the feasibility of spreading the loss. These factors are illustrative, not exclusive. Plaintiff pleads each risk-benefit factor below.

148. Those factors weigh against the AirTag's design. The AirTag's utility as an item finder is preserved by effective anti-stalking safeguards. The likelihood and seriousness of injury are substantial because a concealed AirTag can enable stalking, terror, assault, and loss of personal safety. Feasible safer alternatives included immediate alerts; disclosure of every unknown AirTag traveling with the tracked person; precise on-demand location for the tracked person; a louder, persistent speaker; and automatic Android detection. Apple could have eliminated or materially reduced the danger without impairing the AirTag's item-finding utility. A tracked person cannot reasonably avoid a concealed device hidden in a vehicle, and Plaintiff was unaware of the danger and received no suitable warning. Apple is better able to spread the loss arising from its product than the individual victim.

149. The alternative designs alleged above meet that standard. Each was economically and technologically feasible when the AirTag left Apple's control. None would have substantially impaired the AirTag's utility for finding lost items. Immediate alerts, alerts that disclose every unknown AirTag traveling with the tracked person, precise on-demand location by the tracked person, a louder persistent speaker, and automatic Android detection would have prevented or significantly reduced Plaintiff's injury. The AirTag did not conform to the state of the art when sold. Competing technology and Apple's own later updates show that faster alerts, louder speakers, and automatic cross-platform detection were achievable when the AirTag was released.

150. The design defect was a substantial factor in causing Plaintiff's injuries. The Stalker's use was not an unforeseeable, superseding cause; it was the precise use Apple anticipated, was warned about, and designed safeguards—inadequately—to address. Had Apple adopted immediate, specific alerts disclosing every unknown AirTag, precise on-demand location, and a louder persistent speaker, Plaintiff would have been alerted to the AirTag in her vehicle and able to locate and disable it before discovering it only when its battery chirped from inside the center console. Those alternatives would have prevented or substantially reduced the period in which the Stalker could monitor Plaintiff's location and confront her after she left work.

151. Apple designed the AirTag's unwanted-tracking safeguards to prevent this precise criminal use: an AirTag owner covertly tracking another person. The Stalker did exactly what those safeguards were built to stop. A risk that Apple foresaw and designed against cannot be a superseding cause.

152. As a direct and proximate result, Plaintiff suffered the injuries and damages alleged above, including severe mental anguish, loss of safety, and economic loss.

153. Plaintiff does not seek exemplary damages under Colorado law in this initial Complaint and reserves the right to seek leave to add such a claim as permitted by Colo. Rev. Stat. § 13-21-102(1.5)(a).

**COUNT VII**

**STRICT PRODUCTS LIABILITY: FAILURE TO WARN**

**(Colorado Law; Pleaded in the Alternative)**

154. Plaintiff repeats and realleges the preceding paragraphs.

155. When the AirTag left Apple's control, Apple knew or reasonably should have foreseen the risk that the AirTag would be used to covertly track and stalk people. The danger of a concealed AirTag was not open and obvious to Plaintiff, and there was a substantial likelihood that a timely, specific alert would have prevented or reduced her injury. Colorado's product liability statute expressly covers the failure to warn or protect against a danger or hazard in the use, misuse, or unintended use of any product.

156. Apple failed to give adequate warnings of that danger, and failed to give adequate instructions to avoid it, to the people the danger threatened. Among other things, Apple failed to:

a. provide timely alerts to people being tracked, rather than alerts that issue only after the AirTag has traveled with them for hours or days;

b. provide alerts that are persistent, distinct, and accompanied by a sound loud and continuous enough to locate a concealed device;

c. instruct tracked persons how to locate an AirTag hidden in a vehicle or personal effects;

d. disclose that disabling Location Services would also disable unknown-AirTag alerts; and

e. accurately disclose the scope of AirTag stalking, which Apple publicly called "rare."

157. Apple's alerts are themselves warnings directed to the people being tracked. Plaintiff, an iPhone user, was the intended recipient of those warnings within Apple's integrated AirTag system.

158. The lack of adequate warnings and instructions rendered the AirTag unreasonably dangerous. The risk was not open and obvious to Plaintiff, and it was not a matter of common knowledge. The AirTag was hidden from her.

159. The warning defect was a cause of Plaintiff's injuries. There was a substantial likelihood that a timely, specific alert, accompanied by effective instructions to locate the device, would have led Plaintiff to find and disable the AirTag before its battery chirped from inside the center console and before the Stalker could use it to monitor and confront her after she left work.

160. Apple designed the AirTag's unwanted-tracking warnings to prevent this precise criminal misuse: an AirTag owner covertly tracking another person. The Stalker did exactly what those warnings were built to stop. A risk that Apple foresaw and warned against, inadequately, cannot be a superseding cause.

161. As a direct and proximate result, Plaintiff suffered the injuries and damages alleged above.

**COUNT VIII**

**NEGLIGENCE**

**(Colorado Law; Pleaded in the Alternative)**

162. Plaintiff repeats and realleges the preceding paragraphs.

163. Apple owed a duty to exercise reasonable care in designing, testing, marketing, and supporting the AirTag, and in warning of its dangers. That duty ran to persons Apple foresaw would be tracked with AirTags, including Plaintiff.

164. Plaintiff was not a remote bystander. She carried an Apple iPhone and was the intended recipient of the iOS unwanted-tracking alerts that Apple designed as part of its integrated AirTag system.

165. Apple breached that duty. Among other things, Apple:

a. released the AirTag knowing its safeguards would only "deter as opposed to prevent" stalking;

b. designed alerts that issue only after a tracking device has traveled with the victim for hours or days;

c. designed a speaker too quiet, too brief, and too easily muffled to lead a victim to a concealed device;

d. failed to adopt the feasible safer alternative designs alleged above;

e. failed to adequately test the AirTag's anti-stalking features in real-world concealment scenarios; and

f. continued to sell the AirTag after learning of tens of thousands of stalking reports, while publicly minimizing the problem.

166. Apple's breaches were a proximate cause of Plaintiff's injuries. The Stalker's use was foreseeable. It was the very harm Apple's safeguards were meant to address.

167. Apple designed the AirTag's unwanted-tracking safeguards to prevent this precise criminal use: an AirTag owner covertly tracking another person. The Stalker did exactly what those safeguards were built to stop. A risk that Apple foresaw and designed against cannot be a superseding cause.

168. Plaintiff's emotional distress damages are recoverable. Apple's negligence exposed her to an unreasonable risk of bodily harm: it enabled Stalker to locate her, follow her vehicle, drive aggressively near her, and threaten her, placing her within the zone of physical danger and in fear for her safety. Her distress has also manifested in the physical symptoms alleged above. Plaintiff's distress has produced physical symptoms. When the Stalker followed and threatened her, she feared imminent bodily harm.

169. As a direct and proximate result, Plaintiff suffered the injuries and damages alleged above.

170. Plaintiff does not seek exemplary damages under Colorado law in this initial Complaint and reserves the right to seek leave to add such a claim as permitted by Colo. Rev. Stat. § 13-21-102(1.5)(a).

**COUNT IX**

**VIOLATION OF THE COLORADO CONSUMER PROTECTION ACT**

**(Colo. Rev. Stat. §§ 6-1-101 et seq.; Pleaded in the Alternative)**

171. Plaintiff repeats and realleges the preceding paragraphs.

172. Apple engaged in deceptive trade practices in the course of its business, in violation of Colo. Rev. Stat. § 6-1-105(1)(e) and (g). Specifically: (a) in its April 20, 2021 press release announcing the AirTag and in its product webpages and marketing materials published from April 2021 forward, Apple represented that the AirTag was designed to discourage unwanted tracking and had built-in protections against it; (b) in public statements to the press from 2021 forward, Apple described AirTag stalking incidents as "rare"; and (c) in those same channels, Apple failed to disclose facts it knew, including that its safeguards would only "deter as opposed to prevent" malicious use, that iPhone alerts issue only after a delay, that the speaker could be muffled or removed, and that it had received tens of thousands of unwanted-tracking reports. Those representations were false or misleading when made, and the omitted facts were known to Apple and material.

173. Apple acted knowingly or recklessly. Its conduct occurred in the course of its business, as Apple designed, marketed, sold, and supported AirTags nationwide and made uniform safety representations to the marketplace. The conduct significantly impacted the public as actual or potential consumers because it concerned a mass-marketed product and safety representations directed to consumers generally. Apple's conduct was knowing and intentional within the meaning of Colorado law. Apple described stalking as "rare" while its internal data showed more than 40,000 unwanted-tracking reports.

174. Plaintiff suffered injury in fact, including emotional distress, loss of personal safety, and out-of-pocket security, legal, and treatment-related expenses. Apple's deceptive practices caused those injuries. By telling the public, law enforcement, and iPhone users like Plaintiff that the AirTag was designed to discourage unwanted tracking and that stalking was rare, Apple led them to believe that an iPhone would detect and warn of any AirTag being used to follow its owner. Plaintiff relied on her iPhone to protect her and had no reason to search her vehicle for a hidden tracker. Apple's misrepresentations and omissions delayed her discovery of the AirTag and

extended the period during which Stalker monitored and confronted her. Had Apple disclosed the truth, Plaintiff would have inspected her vehicle and taken protective steps sooner.

175. The CCPA elements are satisfied: (1) Apple engaged in an unfair or deceptive trade practice; (2) Apple engaged in that practice in the course of its business; (3) the practice significantly impacts the public as actual or potential consumers of Apple's goods; (4) Plaintiff suffered injury in fact to a legally protected interest; and (5) Apple's practice caused that injury. A plaintiff need not be a consumer of the defendant's goods to sue when these requirements are met. The safety representations and omissions were material because a reasonable consumer would consider effective anti-stalking safeguards important to the use and purchase of a location-tracking product.

176. Plaintiff seeks all remedies available under Colorado law, including actual damages, statutory relief under Colo. Rev. Stat. § 6-1-113 to the extent available, equitable relief, attorney fees, costs, and any other appropriate relief.

177. This Count is pleaded in the alternative and is supported at least by the same defect and warning allegations that support the other Counts.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that the Court enter judgment against Apple and award the following relief:

a. Judgment in Plaintiff's favor on the causes of action in this Complaint, including, in the alternative, the Colorado-law causes of action;

b. Actual damages, including for past and future mental anguish and emotional distress, and the cost of any related treatment, in an amount to be proven at trial and exceeding $75,000;

c. Punitive damages under Cal. Civ. Code § 3294 and, in the alternative, Plaintiff reserves the right to seek leave to add a claim for exemplary damages under Colorado law as permitted by Colo. Rev. Stat. § 13-21-102(1.5)(a);

d. Reasonable attorney's fees as permitted by applicable law;

e. Pre-judgment and post-judgment interest as permitted by law;

f. Costs of suit; and

g. Such other relief as the Court deems just and proper.

Dated: November 3, 2026

Respectfully submitted,
**STINAR LANNEN, PLLC**

By: /s/ Patrick Lannen
Parker G. Stinar, Esq. (pro hac vice forthcoming)
Patrick C. Lannen, Esq. (pro hac vice)

Counsel for Plaintiff

**DEMAND FOR JURY TRIAL**

Under Federal Rule of Civil Procedure 38(b) and Civil L.R. 3-6, Plaintiff demands a trial by jury on all claims and issues so triable.

Dated: November 3, 2026

Respectfully submitted,
**STINAR LANNEN, PLLC**

By: /s/ Patrick Lannen
Parker G. Stinar, Esq. (pro hac vice forthcoming)
Patrick C. Lannen, Esq. (pro hac vice)

Counsel for Plaintiff